Thank you both. We have one remaining case on the calendar, Moreno v. Vi-Jon. It is case number 23-55631. Good morning and may it please the court. My name is Naomi Spector on behalf of Plaintiff Appellant Anthony Moreno. I'm going to attempt to reserve five minutes of my time for rebuttal. The District Court once again committed a reversible error by dismissing plaintiff's complaint at the pleading stage. In direct contravention of established Ninth Circuit precedent, under the guise of the reasonable consumer standard, the District Court substituted its own unfounded fact-finding for the well-pled facts of the Fourth Amendment complaint. If allowed to stand, the District Court's decision will disrupt the long-standing Rule 8 jurisprudence of this circuit by permitting a District Court to ignore and dispute the plausible facts-pled. The facts of this case are straightforward. Plaintiff purchased hand sanitizer products bearing front-label statements that say that the products killed 99.99% of germs, followed by an asterisk, which references a rear-label statement that the products are effective at eliminating 99.99% of many common harmful germs and bacteria in as little as 15 seconds. Plaintiff alleges that both the front- and back-label statements are false as they are written and misleading to reasonable consumers. Can you address the rope? You know, we've got these two cases that were from the same panel, the Souter case and the Rubles case. Can you kind of address those and how this case fits in that? They're not binding on this panel, but we try not to disagree if we can. So, you know, which one of those should we follow and why? Or maybe not either one. Maybe this is a different kind of case. Certainly. So Souter v. Edgewell and Rubles v. Gojo were decided three days apart. This panel should follow Souter v. Edgewell and not Rubles v. Gojo because the facts of this case are akin to Souter v. Edgewell. In Rubles v. Gojo, the facts are readily distinguishable because in that case, the plaintiff alleged that they believed that the product would kill all germs everywhere. In this case, as in the Souter case, the plaintiff alleges that he believed that the products would kill all germs on his hands, including common germs. And so that distinction— Is that what the Rubles—you know, it's a short—it's a memdisco, so it's a short decision, but is that what the decision turned on? It actually—so the first—the second sentence of that decision states, and this is the Ninth Circuit decision from August 3, 2023, because we agree that Rubles fails to state a plausible claim that the reasonable consumer would be misled into thinking the product kills 99.99% of all germs in existence or all germs known to science, we affirm. And so the decision really does turn on that. And importantly— Does it turn on the label or does it turn on the allegations the plaintiff made in the case? It turns on the allegations that the plaintiff made in that case. So when you said facts, I thought that was—that's what I'm trying to get at. I don't think it's distinguishable on the facts of the—you know, the label. I think that case rose and fell based upon what the plaintiff alleged. I agree with you, Your Honor, and I believe, if I'm not mistaken, in that case, the plaintiff was given the opportunity to amend their complaint before the district court and declined to do so. And so the Ninth Circuit was not pleased that the plaintiff had not addressed the district court's opinion when given the opportunity to do so, and then asked—and then the plaintiff had to stand on those facts. I'm not being displeased, but the plaintiff was boxed in and said, that's my complaint, those are my allegations. But I don't think you've had a chance to answer Judge Van Dyke's question about Souter. So Souter v. Edgewell is a hand wipe product. It also states on the front label, kills 99.99% of germs. There's no asterisk in Souter, and there's a different statement on the back label than is at issue here. However, where the cases are aligned is when you look at the pleadings. What was pled in Souter and what is pled in this case are aligned in terms of the plaintiff's allegations that the products fail to kill germs on hands and fail to kill common germs. And I would like to quote, if the court will indulge me, from the Souter court, and it really drives home the point that the cases are aligned in terms of the facts of this case as pled and the facts of Souter, the court found that the allegations that the active ingredient in the hand wipe product cannot, quote, eliminate many pathogens that are commonly found on hands and responsible for millions of infections each year plausibly suggest that a reasonable consumer could be misled by the label's assertion that the hand wipe kills 99.99% of germs. And that is referencing the allegations of the complaint. So I think that's right. So let me ask you, in this case, the product in this case on the front label, I'm going to say, and I'm going to assume it's ambiguous, and there's an asterisk, which I think is very meaningful. And so on my scorecard, I look at the back label. And the question is whether that clarifies what I think is an ambiguous front label. And the problem with the back label, it seems to me, is that it says many, many, and I'm reading many types of germs. Why is that wrong, as opposed to just not promising very much? Right. And so when you say that it clarifies, I don't disagree with you. I agree with you. And so what Williams v. Gerber teaches us is that a back label that is clarifying confirms, right? So in Williams v. Gerber, the ingredient list confirmed the representations on the front, or in that case disputed. But here, the back label does not serve as a confirmation because, as alleged,  And the reason for that is because, as alleged, the products fail to kill approximately 40% of the germs that are most commonly found on hands. So when you have a statement like the one on the back label here that says effective at killing 99.99% of many common harmful germs and bacteria, the allegation is that consumers understand that to mean that it kills more germs than the products in fact kill. So if it doesn't kill 40% of the types of germs that could be on your hand, that means that, I mean, I don't know if it's necessarily true, but in theory it could kill 60%, right, the leftover, and that seems to be many. That even seems to be most. So I'm trying to understand why that helps you and doesn't help them, because if you give any weight to the word many. Sure. So that would be a question of fact, right? And our argument is that you can't make that determination at the pleading stage. Let me ask you a question that might help with that. So let's just change one word in the back label. If it said effective at eliminating 99% of one common harmful germ, right, then it would be pretty clear, I think, to any reader that it's talking it will kill 99% of the population of one type of species, type, whatever, of germ, right? Right. So do you think that statement would be misleading? Effective at eliminating 99% of one common harmful germ, would that be misleading? If it actually did kill, you know, almost all, you know, basically effectively all of that particular species, if you used it, would that be misleading? So hypothetically speaking, if I saw the back label statement, which is not what's alleged here, would that statement ameliorate for me the falsity of the front label representation kills 99.99% of germs and I'm a reasonable consumer? I don't think it would. And the reason is because under the case law, you can't disclaim something that's false on the front with a statement on the back. That's very clearly said in the recent Ninth Circuit case in McGinnity versus Proctor and Gamble, right? You can't make a materially false misleading statement. That's not quite what McGinnity says. McGinnity talks about an unambiguously false statement on the back, right? Right. And if I think that the front label is ambiguous in this case but not unambiguously false, right, it seems to me that is another slice of case. But you have an asterisk here. So I think that you easily get over the hurdle that we're going to look at the back label, hence my point, which is I think we're looking to see whether it clarifies. Do you think that that decision tree is wrong? Respectfully, I think that as PLED, the front label statement is most important and we state that the back label statement is in small and very difficult to read font. And then we cite in our papers to Moore versus Trader Joe's, which I know has been talked about at some length, with the Manuka honey, right, and the distinction between a consumer of a specialty product like Manuka honey that would be charged with scrutinizing a label and a consumer of an everyday low-cost good like the hand sanitizer at issue here who wouldn't necessarily turn the back label over and scrutinize that label statement. I think that I'd like to ask you to shift gears a little bit. Sure. Let me just ask you as a hypothetical. If the front label is ambiguous but not unambiguously false, there's got an asterisk on it, so we look at the back, and if the back label, we look to see whether it clarifies, and since it says that this product kills many, 99% of many, then that could be read as just not promising very much, right, which I think would be bad for you. You have another claim that I'm not sure the district court dealt with,  and that's where you argue that the product, the reasonable consumer would understand if you put this stuff on your hands, 99% of certain types, most common types of germs and viruses on the hand would be killed, and then, in fact, that's not true in the real world because we all have stuff on our hands, oil, hand lotion, whatever, so that that's misleading, but I think for a very different way, in a very different way. Right. What I can't figure out is whether that is, I think you pled that very clearly. I look to see in the opposition, your opposition to the motion to dismiss. Do you think the district court's order grappled with that? I don't think it did at all. I think it completely disregarded that fact, and the scientific— It's not a fact. It's an allegation. The allegation, which is supported by the scientific declaration that we submitted before the district court that the presence of things like grease or grime or sweat on your hands dramatically reduces the efficacy of hand sanitizer. Here's why I'm not sure whether the district court grappled with it or not. The district court has some statements in his order, in the order, to the effect of, everybody knows you have to wash your hands. Schoolchildren know you have to wash your hands. So I'm trying to figure out whether, was this allegation missed? Because this is a Fourth Amendment complaint. I think the district court was understandably frustrated to try to figure out what is your theory. And I have a lot of—as a former trial court judge, I have sympathy for the district court judge. He shouldn't have to guess. And I think he's working really hard to try to figure out what is the complaint here, what is the allegation. So hence, I looked at the opposition to see, did you really raise it? And I think you did, but it sure wasn't the focus of your argument. So where do I look to see that he ruled on it? You think he didn't. I think that he didn't. What about his allegation? Then why would he include these statements that children, schoolchildren know you have to wash your hands? What's that mean? What's that about? He uses that fact to ameliorate the falsity of the label representations in a vacuum. He doesn't reference back to, you have to wash your hands before you use hand sanitizer, right? He doesn't say that in the absence of having clean hands, hand sanitizer can't be effective, and therefore hand washing is also important. He never makes that connection at all. He just says, everybody knows hand washing is important, period, therefore reasonable consumers aren't misled by these label statements. One other thing I want to ask you about, you several times talk about the—well, the order says that you didn't abide by the mandate. Because he'll say, well, you make the allegations that now you're talking about types of germs on hands that commonly appear on hands. But in the very next sentence, you know, you scooted back to this very broad suggestion that you're talking about germs in the universe. So he's trying to nail you down. What is your claim? What is your response to that? So our response is really that we do talk about—we try to start from a very broad context and narrow it down, right? So here's how ethyl alcohol works. Here's why ethyl alcohol is not effective in general. Here's why ethyl alcohol is not effective against a subset of germs on your hands. And here is why the products are not effective against germs that are commonly found on hands. And so we tried to take a broader perspective by taking a step back to really explain to the court what ethyl alcohol is and what its limitations are. All right. My understanding is that by doing—your briefing talks about this funneling. Tell me what your claim is now. Is it the top of the funnel or the bottom of the funnel? Were you using that as an example? The district court needs to know what your claim is. Right. Okay. So the claim is that the products do not kill 99.99% of germs commonly found on hands. As a matter of fact? As a matter of fact. Okay. All right. And I think your claim is that's true in the vacuum and that it's truer still in real life when people have stuff on their hands. Absolutely. Okay. We'll put two minutes on the clock when you come back. Appreciate it. Thank you, Your Honor. May it please the Court, Anthony Hopp on behalf of Vigeon, LLC. This case has been dismissed four times. We're now on our second trip to the Ninth Circuit, and the plaintiff is once again arguing, like he did the last time, that the district court misread, misunderstood, misinterpreted his Fourth Amendment complaint. The district court did nothing of the sort. This Court should affirm because the district court's fourth dismissal order in this case properly applied Twombly, Iqbal, McGinnity, Robles, and its judicial experience and common sense to hold that the non-conclusory factual allegations in the Fourth Amendment complaint are not sufficient to state a claim. The district court was not required to accept as true or sufficient allegations which are merely conclusory. The district court correctly observed that the plausibility review that it was undertaking under Iqbal and Twombly is context-specific and requires the court to draw on its judicial experience and common sense. Here, the court correctly used that common sense to hold that, taken together, the entire complaint, the plaintiff's allegations do not add up to a valid claim that the label statements on Vigeon's products would be misleading to a reasonable consumer. The plaintiff contends that to survive a motion to dismiss, all he had to do was to plead that the product does not kill 99.99% of common germs on hands. There's two problems with that. One, it's not the label claim. The label claim is not what the label says. The plaintiff's claim, again, mischaracterizes the label. The label says, as the court pointed out, many. The rear label says the product kills 99.99% of many common harmful germs in 15 seconds or less. It doesn't promise to kill all common germs on your hands, and that's what plaintiff claims. So what do you do with the argument that, well, in fact, if I'm a normal person with normal sort of greasy hands and I use this, it does not, in fact, kill 99% even of the germs that might be killed in laboratory conditions? Sure. The greasy hands argument is something that the district court did deal with previously, dealt with previously, and I think dismissing the First Amendment complaint or the Second Amendment complaint. So you have to go back a couple of decisions in this case to read what the court said, but the court has disregarded that several times, and here's why. Ordinary consumers don't use hand sanitizers when they're fishing, gardening, making hamburger, things like that. When your hands are greasy, grimy, dirty, wash them, and that's the importance. The court didn't talk about hand washing and what children know in a vacuum. It was in that context that you know. There are an awful lot of people who use hand sanitizers when they sort of walk into an unfamiliar place. They don't wash their hands first. They just use the hand sanitizer. Sure. They use hand sanitizer when soap and water are not available, and that's the main thing. They might use them just anyway. I mean, so I don't think you can fully answer the claim by saying people will wash their hands and then use hand sanitizers. No, we don't say people wash their hands and then use hand sanitizer. They use hand sanitizer and maybe then wash their hands. If you're in the grocery store. Or maybe not. Or maybe not. That doesn't seem to me that that necessarily then answers the objection, which is to say that it depends whether you're going to get 99.9. It depends on whether you've washed your hands first. In a normal situation. I mean, we're talking about, I think, an abnormal situation. Hands are greasy, grimy, dirty. I mean, that's what the complaint says. Greasy, grimy, dirty. Not getting out of your car and going into the grocery store. Greasy would mean I could put hand lotion on my hands, though. It could. And if you're using hand sanitizer to take hand lotion off, then you're not using it reasonably. That's not what it's for. I mean, your hands are greasy, grimy, dirty. The product does not promise to clean your hands. It is not a hand cleaner and it's not advertised that way. I just asked her, what's your claim? Because I'm very mindful this is a Fourth Amendment complaint. And her first answer is that it doesn't clean 99.99%. It doesn't do that. And then her second argument, which I think is a different theory, is in real life it also doesn't do that. So I think she's saying even in a Petri dish, just scientifically, as a matter of fact, we can show that it doesn't kill that number of types of germs that are commonly found on hands. And then I think it's a separate argument. And, by the way, in real life it won't because people have stuff on their hands. Yes, Your Honor. Okay. Yes. Go ahead. Okay. And I don't believe that's what the amended complaint says. I mean, it says if you read the amended complaint as the district court did, you read it all, the first thing it says in paragraph 12, footnote 3, is that consumers believe that it will kill all or nearly all germs on hands. They understand that it means that it completely kills all germs on hands. That's how the complaint starts off. And case after case has rejected that, including Robles, that it doesn't promise that. It never promises that. And then they talk about in a Petri dish what it does or doesn't do. There is an allegation in there that it only kills, I think, 2% of germs, which are 2% of 1,227 germs, which are pathogenic and transmissible by hands. It toggles back and forth between this, all germs and transmissible by hands. Only two points in the complaint, I think it's paragraph 17 and maybe paragraph 47, does it say many common harmful germs in hands. But then it, as the district court points out, immediately thereafter starts talking about transmissible, starts talking about specific germs. But I agree with you. I have tortured my law clerk over this case for the last couple weeks to figure out, you know, what does it say. And I do think it's challenging. But I think she's clarified today what she's talking about. And so that's what I'm trying to get your response to. She may have attempted to clarify what she's talking about. I don't think the amended complaint clarifies that at all. And I think we're with the amended complaint here and how the judge read it and whether or not Judge Miller read it again correctly. It has many things in it, but Judge Miller read it all and distilled it. And you cannot take the couple of times where the complaint sprinkles the word common in there and divorce that from the rest of the complaints. Well, I was trying to make a different point following up on your comment. I mean, it does say the kinds of, and I think her backup talks about types of germs that are transmissible by hand. You think that doesn't mean that they're commonly found on hands or that's not a proxy, that's not sufficient? The way the complaint, yes, exactly, Your Honor. I believe that just saying that it doesn't kill germs which are common and transmissible by hands is not the same thing as saying it doesn't kill many common harmful germs on hands. The product, as the Court pointed out earlier, doesn't promise everything. Her first theory, I think, is her toughest. I'll grant you that because you have seven minutes left. I'm more concerned about paragraphs 49 and 50, about in real life. People understand that that is a given, that that's what's going to happen if they put this stuff on their hands. And her paragraphs 49 and 50 say in real life people have stuff on their hands, oil, sweat, whatever. What about that? Again, Your Honor, I think the real point is that you have to think about how ordinary, normal, reasonable consumers use hand sanitizer. If you've just put hand lotion on your hands, the next thing you're going to do is not to use hand sanitizer. Okay, but I put hand lotion on my hands because I'm sitting at the desk and I work with paper all day, and then an hour later I want to use hand sanitizer. I still have some lotion on my hands, don't I? You might, Your Honor. I don't know. You may or may not, but the product is still going to kill many common germs on your hands, even if it doesn't kill all of them, even if there's something having to do with it. The point is that it promises to kill 99.99 percent. Her first argument is it doesn't do that in a Petri dish. I don't know because we're not finding facts. And then her second argument is people don't have their hands in Petri dishes. They put this stuff on their hands, not Petri dishes. That's true. The product has to be tested, Your Honor. Yes, sure. And as we pointed out in our response to the amended complaint and below, many, many times it's tested according to FDA standards. FDA does say use it in a Petri dish. Test it according to this method. You bet. And that's how it's done. And so that's why I'm not talking about the first theory. Right. I'm talking about the second theory because people don't buy it to put it in Petri dishes. They buy it to put it on their hands. Right. Okay. But that said, the Petri dish method is the way that it's tested, and that's what's represented. It kills those germs, and if those germs are on your hands, it will kill them. I understand Petri dishes, how it is tested. I'm not sure I agree with you that that's how it's represented. I mean, there's nothing here that says kills 99.99 in Petri dishes. Fair enough. It's a hand sanitizer. Fair enough, Your Honor. Yes, it does. And it talks about this number without qualification. I'm supposed to assume, at least I'm going to assume, you're talking about what happens on hands, not in Petri dishes. Absolutely, Your Honor. But I'm also— I only spent half of the last oral argument that it's hand sanitizer. I was there. Correct. That was hand sanitizer, and so certainly we're talking about how it behaves on hands. Right. That's right. Okay. So I think Judge Fletcher's point on this is well taken, but I would appreciate your response. Yes, and again, all I can do, Your Honor, is go back to what a reasonable consumer does, what a reasonable consumer thinks, if your hands are dirty, greasy, grimy. And we're not talking about maybe a little bit of hand lotion from an hour ago. We're talking about gardening, fishing, things like that. Wait a minute. Who do you think we are? Does it kill 99.99 if I put hand lotion on my hands two hours before? I doubt it. That hasn't been proven, Your Honor, and presumably has not been tested. We're not at the proof stage. We've been through many, many iterations at the complaint stage. That's true. We've been through many, many iterations. And I will say, again, I mean, my response is what my response is, that ordinary consumers use it the way they do. And think about it. I mean, where does one use hand sanitizer? Wait a minute. Ordinary users use it. How do you think ordinary users use it? Reasonable consumers. Just think about it. Think how where you see hand sanitizer, where hand sanitizer is used. All over the place. All over the place, in the grocery store, in the bank, here, on the bus. When you don't have soap and water available. It is not a substitute for soap and water. And that's what it goes back to. If your hands are dirty, greasy, grimy, you shouldn't wash them. That's what the judge said. Right. So I'm not trying to be difficult. I'm really not. And I understand you've made several trips to the podium on this case. But here's the problem. It is ubiquitous, hand sanitizer, now. So people use it all over the place. I don't think that helps you. I think that hurts you. Right? Because it's representing that it will kill 99.99% of germs commonly found on my hands. Isn't it? In all of those different scenarios? Whether I'm at the airport or... Many. It will kill many of those common germs on your hands. Yes, Your Honor. 99.99% of many common germs on your hands. Not every single one. And maybe not in every scenario. I understand it will kill many. But when I'm in the airport, of the germs that it will kill, really, effectively, will it kill 99.99%? If I'm just a person in an ordinary life, I just show up at the airport? I don't think so. It will if I'm a Petri dish. But if I'm just an ordinary person living my ordinary life and I show up at the airport, am I going to get 99.99% on those germs that it kills effectively? Well, let's talk about what it is and what it does, Your Honor. It's alcohol. It's ethyl alcohol with surfactant. I understand what it does. And what it does is it denatures protein. Now, the ordinary consumer may not know that, but to your point, what it does is any germ that's got a protein shell, it will kill. Now, will it get through? If you use enough of it, maybe it will get through your lotion. But, I mean, if it touches the surface of your hands, it will kill, it will denature every bacteria because they're covered in protein. There's a few non-enveloped viruses that it will not kill. And that's where the many comes in. It doesn't kill all of those germs. And so if your hands are dirty, greasy, grimy, an ordinary consumer, maybe you take an extra shot of it, right? Maybe you use a little bit more of it. But it will, once it gets there, it will kill those germs on your hands. It kills many germs on your hands. I'm focusing on the part that Judge Kristin has focused on. It does not say in laboratory conditions. It implies that in ordinary real-life conditions, 99.99% will be killed. That strikes me as not literally true. It states that it will kill 99.99% of many common harmful germs on your hands. And of those for which it is really effective, in ordinary real life, where I've been out, I don't know, doing stuff, maybe I did put hand lotion on a couple hours ago, maybe I put on some sunscreen a little bit ago. Maybe you shook hands with somebody else. Is it going to kill 99.99? I doubt it. It's going to kill an awful lot. It will. 99.99 is what you did in the lab. Right. And what we say, it will kill 99.99% of every single germ that it's tested against, according to those FDA standards, in the lab. But my point is, as to those against which it is very effective, so I'm in your category. Yes. In real life, as opposed to the lab, how do I know that you'll actually kill 99.99? I don't think you've shown that. And I submit that on the label it says many. But it says 99.99 of many. I'm now in the category of which it does 99.99, and as to those in real life, I'm not sure that's true. Even in real life, Your Honor, our submission is that it will kill 99.9. It is 99.99% effective with respect to many common harmful germs. In the lab. So if it misses a couple. In the lab. In the lab and on your hands, Your Honor. Wait a minute, that's what I don't understand. It's not been tested on your hands, I warn you. That's my point, and I think I just interrupted Judge Fletcher. I'm sorry. You're good. I just assumed that I get up in the morning, I take a shower, I'm pretty good, and then from there on out it's all downhill. I touch my car keys, I touch my refrigerator handle, I touch a doorknob. And so I think our hands are, I didn't even want to think about it, probably pretty disgusting. I'm not going to say you're disgusting. I don't blame you. I don't blame you. But if I look at the label, I think it's, right, because our hands go all over in the world touching knobs and shaking hands. Right. That's the representation people are relying on, it seems to me. I don't mean to beat this dead horse, but isn't that a big problem for you? I don't believe so, Your Honor, because, again, you use hand sanitizer when soap and water are not available. The context, the real-world context, isn't just hand sanitizer. The real-world context is hand sanitizer plus soap and water when it's available. It is not a substitute. It's not sold as a substitute. Under what circumstance does the product kill 99.99% of common germs found on hands? Outside of a Petri dish. When it touches those germs on your hands. Petri dish or your hands. As long as I just stepped out of the shower. No, not necessarily, Your Honor. You get bacteria on your hands, it will denature all those bacteria. Your example was if there's something between the bacteria and your hands. That's a problem. My premise is I'm suspecting that there is a lot. There may be a lot more. Sweat, dirt, hand lotion. No? Not. Grime from just touching other things. Grime, yes. If there's grime, you wash. That's our point. If there's grime. Okay. The label doesn't say 99.99 in the lab. It doesn't say if you wash your hands first. It just says 99.99. Right. And if the product touches the germs on your hands, if it can contact those germs, it will kill them. How do we know that? Because it does it in the Petri dish. And you've said a lot more than is on the label. It's hand sanitizer, Your Honor. It kills the germs on your hands. And it's very effective insofar as what it does. The question is whether it lives up to the label. We believe it does, Your Honor. You've been very patient. Go right ahead. This is kind of something I haven't really thought a lot about. So I'm looking at the, I guess it's the Fourth Amendment complaint, yeah. And so it's paragraph 16, ER 152. It says, it just has this one sentence. It says, the products are additionally ineffective for dirty, greasy, sweaty, or wet. Is that the only allegation in the complaint? Or is there other allegations? I'm trying to figure out, this just seems pretty conclusory to me. I think we're looking at 49 and 50. 49, oh, paragraph 49 and 50. Is there, I'm trying to remember, is this a fraud claim, right? And so there's heightened pleading requirements for, so can you just assert that, I mean, can they just assert that? I mean, I'm trying to figure out here whether I even think this is a true assertion or not. And I know we have to take assertions at this stage as true, but that's the whole point of the heightened pleading requirement for fraud claims, is that normally you have to, like, do something more than just say it. What's going on there? In this complaint, Your Honor, I would submit that that is conclusory, and it doesn't satisfy Twombly. Because we're talking about lotion stuff, and I'm trying to figure out, like, I mean, I don't think any of us have any idea whether it actually, like, you know, if I put on lotion and one hour later or two hours later used hand sanitizer, what it actually does. Does it kill 99% of some? I'll use the word some because many and some is not really different in this context. You know, some types of germs. And they basically have a couple paragraphs that say it doesn't, but I'm trying to figure out what to do with that. I guess, you know, the idea would be if we disagree with them on what we're calling part one, the idea that their interpretation of just reading out many so that it kills 99% of germs, and all they're left with is this, this definitely has not been the meat of their case. This is just the tail. But all of a sudden it will become the only thing that's left, and then what? It would go forward as to a trial or to, like, I guess a battle of the experts on whether or not this is what happens when you put lotion on. I would certainly have to go forward on a trial with respect to, you know, who puts hand sanitizer on after they use lotion. I assume that the predominance would be an issue at that point. No, but you're assuming that when you put hand sanitizer on, that statement you just said is assuming that when you put it on after you put on lotion that it's ineffective. But I'm not sure they say that. They don't actually use it to talk about lotion, but they say dirt, moisture, and grime, it's ineffective. I guess we just have to take that as a given. I don't believe you have to take it as a given, Your Honor. I don't think it's well pled. I don't think it's what's best for you. Yeah, so maybe that would help me. What would be, and I'm sorry, but what would count as being well pled? Do we give them a fifth chance, you know, on this issue? I would certainly hope not, Your Honor, and I'm not going to try to rewrite the plaintiff's complaint as I stand here, but I will say that there's certainly not enough in this complaint to say that these are well pled plausible allegations about what happens when your hands are dirty. It's already been up here one time before, and as I understand it you're saying that actually these were directly addressed, these claims, by the district court in the dismissal of the Second Amendment complaint, which is what was appealed up last time up here? I'm not sure it was the Second Amendment complaint. The First Amendment complaint might have even been the third, but that has been addressed below. I'm just trying to figure out whether it was addressed by the court below before it came up, because when I read our admittedly very short Mem Dispo last time up here, it doesn't address this issue at all. It seems to acknowledge that as pled, our whole Mem Dispo last time seems to be on the basis that as pled, yeah, these claims don't cut, they don't fault the district court for having dismissed the claims as pled. They just say you need to give them another chance to replete. So if these claims were already in there, I don't think they're directly addressed by our prior order, but it just seems like, I don't know, it's weird because it's just kind of all of a sudden becoming a big issue in the case, and it seems like it's an afterthought at most in the complaint. Right, which is not what I expected to talk about today because it is an afterthought, and it's not the main part of the complaint. But that said, like I said, it was in a prior complaint. It was addressed below, and I'm not sure which opinion. We'll have to go look. But also in this complaint, it's a couple of perfunctory allegations, and I don't think it satisfies Iqbal and Twombly. So what's missing? I declined to rewrite the complaint. I understand you don't want to write the complaint, but you do say it's not enough, and I think it's a fair question. What's missing? It would have to be more detail about under what conditions, what germs it kills when hands are dirty, greasy, grimy, because it does, it is alcohol. It will cut through whatever's on your hand. I hope you said that. I understand that. So, again, without having thought about it or trying to figure out how it would be best said, I just have to submit, Your Honor, that it's not well said here, not well pled here. And I would ask on behalf of my client that this not be sent back for a fifth time. The defendant has been litigating this case for four years and getting these claims dismissed by Judge Miller for good reasons. And so I would ask that the case not be remanded for that reason. I think last time at oral argument there was a concession, actually, that plaintiffs could amend to cure the problem that was hanging us up last time, hence the remand. What I remember saying, Your Honor, and you and I were facing each other across the same distance, was that if it was pled differently, it might be a different complaint. And that's basically what the Court said. That is that if it was pled differently, it might withstand a motion to dismiss. And it was pled differently, and it didn't withstand a motion to dismiss twice. I think I was speaking to a different point, but that's okay. I'm sure you'd be happy to stop talking about this case at this point. I will get the straight scoop from her. I was just responding. No, there's no secret handshake here. I was just responding to your statement about what happened last time and why it was remanded last time. And I think there was agreement on record, and MemDispo mentioned that. I'm ready to hear from opposing counsel. Thank you, Your Honor. And thank you so much for your patience with our questions. You heard defense counsel say that hand sanitizers used when soap and water aren't available. Those are exactly the situations where you would expect hands to be dirty, grimy, or greasy, which is why it is included in the Fourth Amendment complaint. For example, after pumping gas, right, at the grocery store, there's all kinds of stuff on your hands. The very first paragraph in the complaint says that consumers are entitled to know when hand sanitizer is effective and when it isn't so that they'll wash their hands. Let me go back to—forgive me for interrupting you, but it's the Fourth Amendment complaint. I think Judge Vendik is right and opposing counsel. This was not the—the second theory wasn't the showcase, right? And so here we are. His response is that this is impermissibly conclusory. It doesn't withstand a ball tumbling. What is your response to that, please? So beginning in Paragraph 63 of the complaint, Paragraph 63 through Paragraph 152, we describe the microbes that are not killed by the products that are commonly found on hands and cause at least tens of millions of cases of infection in the United States each year. And we do that by citing to scientific sources, for example, Paragraph 66. So this is all—forgive me again. You're talking now about what I've been referring to as your first theory, where you're just saying it's not true. Right. I'm talking about your second theory, which I'm referring to as not having been your showcase. I apologize. That's all right, which is that in real life, under real-life conditions, it doesn't perform this way. Okay, and so what are the non-conclusory allegations? So we cite to our retained scientific expert, and that expert report was submitted before the district court in response to defendant's opposition to— I'm sorry, in response to defendant's motion to dismiss. And in that report, she talks about how the products do respond under real-world conditions. So there's images of handprints and where consumers wash their hands with soap and water versus using hand sanitizer. All of the germs and bacterium that are left following the use of hand sanitizer where hands are greasy, grimy, dirty, sweaty. And that is all set forth in her expert report, which is generally cited to in this complaint. Can I ask a question about that? Because I'm looking at a complaint. Because I see where you cite to this is Fortuno. Is that right? Fortunato, yes. Yeah, I'm sorry. So I see a lot of sites that it doesn't look to me. And what you do is you have your numbered paragraph, and then you drop a footnote, and you cite to. But I don't see that site with regard to 16 or 49 or 50. And I honestly haven't read the expert report. But you're telling us that if I went and read the expert report, that that expert addressed this dirty, greasy theory. Because all the sites you have are to your other what we might call your first theory. Did you know if the expert addressed the dirty, greasy theory? He did. It's her third opinion in the report. He did? Okay. It's in there. So you could just add a footnote to the 50? I was remiss in not adding a footnote to paragraph 50. That's absolutely correct. I just want to leave the court with one additional item. The last time we were before this court, defense counsel told you that the germs against which defendant does test in a Petri dish are 23 bacterium and two yeast strains. And as pled, those are not found in a common consumer setting, and they are not testing on hands. And that is the basis for the label statements at issue in this case. That defies a reasonable consumer expectation, and it certainly defies the express representations on the labels, which are false and misleading as written. Thank you both for your argument and advocacy. We're going to take that case under advisement and stand in recess for the day. I'll rise.
judges: FLETCHER, CHRISTEN, VANDYKE